### Albert F. FURBUSH, Plaintiff,

v.

### OTSEGO MACHINE SHOP, INC. and Edward Poe, Defendants.

### No. 4:95–CV–121–F1.

United States District Court,
E.D. North Carolina,
Eastern Division.

Feb. 13, 1996.

A. Charles Ellis, Ward & Smith, New Bern, NC, for plaintiff.

Timothy C. Barber, Barber & Associates, Greenville, NC, for defendants.

## ORDER

JAMES C. FOX, Chief Judge.

This matter is before the court on the defendants' motions to dismiss, pursuant to Fed.R.Civ.P. 12(b)(2), based on lack of jurisdiction over the person. Also before the court is the plaintiff's motion to disqualify Timothy C. Barber and Barber & Associates as counsel for the defendants. The parties have fully briefed all the motions, and the court finds them ripe for ruling. For the reasons discussed below, the court will deny the defendants' motions to dismiss, and allow the plaintiff's motion to disqualify defense counsel.

### I. The Motions to Dismiss for Lack of Personal Jurisdiction

#### A. Statement of the Relevant Facts

The court here recites the facts relevant to these motions as revealed in the record, and, as it must, draws all reasonable inferences and resolves all factual disputes in the plaintiff's favor. In the fall of 1993, defendant Otsego Machine Shop, Inc., ("OMS") contracted with the Hexacomb Corporation to design and build a piece of equipment for Hexacomb's Farmville, North Carolina, facility. This equipment, known as "the hugger section," was essentially a set of parallel conveyor belts, one on top of the other, with a gap between them that could be adjusted from zero to six inches. In the spring of 1994, when Hexacomb began experiencing problems with the equipment, OMS sent the engineer who had designed the hugger section, defendant Poe, to Farmville to work on it.

On the morning of March 25, 1994, Poe enlisted the aid of plaintiff Furbush, a Hexacomb employee at the Farmville plant, in diagnosing the hugger section's problems. While Poe manually started and stopped the conveyor belts by touching two wires together at the control panel, Furbush would measure the distance the belts drifted off track. Sometime during this process, the belts started moving without warning to Furbush, dragging his right hand and arm into the gap between the belts, severely injuring him.

OMS was incorporated and has its principal place of business in Michigan. Poe also resides in Michigan. OMS and Hexacomb negotiated and contracted for the manufacture of the hugger section outside the state of North Carolina. All design, manufacture, assembly, and testing of the hugger section occurred outside this state as well. OMS conducts no business in North Carolina, has no office or agent in the state, and has never contracted for the sale of goods or services with any North Carolina corporation. OMS has never owned or leased any real or personal property in North Carolina, and the hugger section in Farmville is the only product of OMS present in the state. OMS does not advertise in North Carolina. Poe, likewise, has no contacts with the state other than those arising from the facts of this case.

However, Furbush sued Poe and OMS in a North Carolina state court, filing his complaint in the General Court of Justice, Superior Court division for Pitt County, on October 13, 1995. He alleged claims for negligent design, manufacture, testing, repair, and failure to warn against Poe and OMS; and for breach of implied and express warranties against OMS. Defendants removed the action to this court on November 14, 1995. On December 21, 1995, they filed amended answers and motions to dismiss certain of the claims against them for lack of personal jurisdiction.

### B. Analysis

■ A federal court sitting in diversity may exercise *in personam* jurisdiction over a nonresident defendant only when a two-pronged test is satisfied. First, some jurisdictional statute, usually a state "long arm" statute, must allow for the exercise of jurisdiction. Second, the exercise of jurisdiction, upon the facts of the case, must satisfy constitutional due process. *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1199 (4th Cir. 1993). Because long arm statutes are often liberally drawn and construed to allow for the exercise of jurisdiction to the fullest extent possible under the due process clause, the second prong of this test often swallows the first. *See, e.g., Id.*

■ Whether the foreign defendant has been afforded due process turns on the nature of the defendant's contacts with the forum state. As often quoted, "due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (citations omitted).

■ The United States Supreme Court and other federal and state courts have, since 1945, expounded upon the "minimum contacts" analysis in a line of cases studied in every law student's first year Civil Procedure course. To aid their analyses, these courts have sometimes defined two kinds of personal jurisdiction—general jurisdiction and special jurisdiction. When the defendant has sufficient contacts with the forum state to warrant the assertion of jurisdiction over it for all matters and all cases, there is said to be "general jurisdiction" over the defendant. The defendant must engage in "continuous and systematic" general business contacts with the forum state to justify the state's subjecting it to such a broad exercise of power. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). On the other hand, when a court in the forum state may exercise personal jurisdiction over the defendant only because the plaintiff's claims arise out of or relate to the defendant's activities within, or in some way directed at, the forum state, there is said to be "special jurisdiction" over the defendant.

The defendants here concede that the North Carolina long arm statute, N.C.Gen. Stat. §§ 1–75.1 *et seq.*, permits the court's exercise of jurisdiction over them regarding all of the plaintiff's claims, thus satisfying the first prong of the test. (Defs.' Mem.Supp. Mot. to Dismiss at 6–7.) Defendants further agree that, regarding the plaintiff's claim for negligent repair only, the operative facts and actions of the defendants occurred in North Carolina. Thus the court may exercise spe-

cial jurisdiction over them, consistent with the strictures of the due process clause, to adjudicate the plaintiff's claim for negligent repair. (*Id.*)

However, say the defendants, with regard to the plaintiff's claims for negligent design, manufacture, and testing; failure to warn; and breach of implied and express warranties, the operative facts did *not* occur in North Carolina. Thus, they continue, the court may *not* exercise special jurisdiction over them, but may adjudicate these claims only if the court finds the "continuous and systematic" contacts with North Carolina required to support general jurisdiction. The defendants argue vociferously, analogizing a recent federal and a recent state case, that those kinds of contacts simply aren't present, and so the court must dismiss these claims.

■ While the court has no quarrel with the defendants' argument regarding the lack of general jurisdiction, the court cannot agree with the premise for their argument: that the court lacks special jurisdiction. Rather, the court finds that the operative facts giving rise to *all* of the plaintiff's claims either occurred in North Carolina, or resulted from the defendants' activity elsewhere that was ultimately directed at this state. In so acting, the defendants subjected themselves to the special personal jurisdiction of the court for the purpose of resolving all of this plaintiff's claims against them.

The court deems this case substantially similar to the situation in *Gray v. American Radiator & Standard Sanitary Corp.*, 22 Ill.2d 432, 176 N.E.2d 761 (1961). In that case, the plaintiff, a resident of Illinois, sued the Titan Valve Manufacturing Company, an Ohio corporation, and others when a water heater exploded in Illinois, injuring her. Titan appeared specially, filing a motion to quash on the grounds that it did no business in Illinois, it had no agent in Illinois, and it sold only completed safety valves to codefendant American Radiator outside Illinois, thus foreclosing any constitutional exercise of personal jurisdiction over it.

After holding that the Illinois long arm statute permitted the trial court's assertion of personal jurisdiction, the Illinois Supreme Court addressed Titan's minimum contacts

argument: that "where the injury is defendant's only contact with the State, [the exercise of personal jurisdiction] would exceed the limits of due process." *Id.*, 176 N.E.2d at 763. In deflating that contention, the court said, "[I]t is sufficient if the act or transaction itself has a substantial connection with the State of the forum.... As a general proposition, if a corporation elects to sell its products for ultimate use in another State, it is not unjust to hold it answerable there for any damage caused by defects in those products." *Id.*, 176 N.E.2d at 764, 766.

Similarly here, Poe and OMS designed and manufactured the hugger section specifically for use in the assembly line at Hexacomb's Farmville, North Carolina, plant. (Am. Answer of OMS ¶ 5.) When that equipment malfunctioned, OMS sent Poe, as its agent and employee, to North Carolina to work on the problem. The accident and injury giving rise to each of the plaintiff's claims in this litigation occurred in North Carolina, while Poe was present and in control of the machinery. Under these circumstances, the court finds that requiring Poe and OMS to defend this suit in North Carolina does not "offend traditional notions of fair play and substantial justice."

*World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), and *Dommel's Hotel, Inc. v. East West Helicopter, Inc.*, 580 F.Supp. 15 (E.D.Pa.1984), cited by the defendants, do not suggest otherwise. In those cases the defendants' only contacts with the state where they had been sued were their manufacture and sale of vehicles, outside the forum state, which injured someone inside the forum state. In both cases the court held that the due process clause prevented the assertion of personal jurisdiction.

Justice White, in *World–Wide Volkswagen,* wrote,

It is argued ... that because an automobile is mobile by its very design and purpose it was "foreseeable" that the Robinsons' Audi would cause injury in Oklahoma. Yet "foreseeability" alone has never been a sufficient benchmark for

personal jurisdiction under the Due Process Clause.

... This is not to say, of course, that foreseeability is wholly irrelevant. But the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.

... When a corporation "purposefully avails itself of the privilege of conducting activities within the forum State," ... it has clear notice that it is subject to suit there....

*World–Wide Volkswagen,* 444 U.S. at 295, 297, 100 S.Ct. at 566, 567 (citations omitted). Here the defendants could not only foresee that their product might find its way to North Carolina; they designed and built the equipment specifically for a plant in North Carolina, and they travelled to North Carolina to service it. They therefore purposefully availed themselves of the privilege of conducting business here, and they had clear notice they could be haled into the courts of this state.

They admit as much with respect to the plaintiff's claim for negligent repair; thus the court finds no burden on the defendants in requiring them to litigate the other claims here as well. Further, this court and North Carolina have a significant interest in adjudicating a dispute involving a resident of this state and district and arising from an injury that occurred here. The plaintiff's interest in obtaining convenient and effective relief is best served by the resolution of all his claims here, as is the interstate judicial system's interest in achieving the most efficient administration of justice. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (setting out the above "fairness factors" to be applied in conjunction with the minimum contacts analysis).

The court finds present here the minimum contacts with North Carolina required to legitimate its assertion of jurisdiction over the defendants. The defendants purposefully availed themselves of the privilege of conducting activities within the state under the protection of the state's laws, so that this court has jurisdiction over them consistent with both the due process clause and traditional notions of fair play. For these reasons, the defendants' motions to dismiss certain of the plaintiff's claims for lack of personal jurisdiction are hereby **DENIED.**

## II. The Motion to Disqualify Defense Counsel

### A. Statement of the Relevant Facts

Plaintiff Furbush retained the law firm of Ward and Smith, P.A., to represent him in May of 1994. At that time, Mr. Timothy C. Barber was one of approximately fifteen attorneys resident in the Greenville, North Carolina, office of Ward and Smith, where plaintiff's file was maintained. Mr. Barber was not assigned to plaintiff's case; the responsibility for handling plaintiff's claims rested primarily with attorney Ryal W. Tayloe, also of the firm.

However, on October 21, 1994, Morris Hinton, a field representative of The Cincinnati Companies, telephoned Barber to discuss the Furbush case. The Cincinnati Companies insured both defendant OMS, and clients of Barber's and Ward and Smith's. Hinton expressed to Barber his concern at Ward and Smith's representation of Furbush against OMS when Barber and Ward and Smith already represented other insureds of The Cincinnati Companies in other matters.[1]

As a result of this telephone call, Barber discussed with Tayloe The Cincinnati Companies' concerns. During these discussions Barber learned from Hinton and Tayloe the nature of Furbush's claim, the circumstances of his injury, the amount of his medical bills, and the anticipated need, or lack thereof, for filing a complaint. Barber claims that he did not discuss with Tayloe any perceived strengths or weaknesses of the case, the merits of Furbush's claims, or Tayloe's strat-

---

1. Neither The Cincinnati Companies' interest in this case nor any possible conflict within Ward and Smith as a result of its work for The Cincinnati Companies is at issue here.

egies for prosecuting those claims. Barber states that he acquired no other information, confidential or otherwise, about Furbush or his case. He has never met or spoken to Mr. Furbush, never reviewed Furbush's file, and never represented Furbush in any matter.

Tayloe, on the other hand, states that it was his practice and the practice of other attorneys at Ward and Smith during 1994–95 to discuss openly pending matters and to share and solicit strategic and case management ideas from other members of the firm. He recalls in an affidavit that he specifically discussed this case with Barber, including the circumstances giving rise to the claims, the nature and extent of his injuries, and "other aspects of Ward and Smith, P.A.'s representation of Mr. Furbush." (Aff. of Ryal W. Tayloe at 2.) Further, he notes that all attorneys at Ward and Smith have access to the files of all clients.

Barber resigned from Ward and Smith effective March 1, 1995, taking other employees of the firm with him to form Barber & Associates. Barber states that upon information and belief, none of his employees who formerly worked for Ward and Smith had any knowledge of the Furbush matter.

As noted above, the plaintiff filed this action October 13, 1995, in the General Court of Justice, Superior Court division, for Pitt County, North Carolina. He is represented by Ryal Tayloe of Ward and Smith. Defendants, represented by Timothy Barber of Barber & Associates, removed the case to this court November 14, 1995. Plaintiff filed his motion to disqualify Barber on December 14, 1995.

### B. Analysis

Local Rule 2.10, EDNC, provides that the Code of Professional Responsibility of the North Carolina State Bar governs the prac-

tice of law in this court. Plaintiff contends that Rules 5.1(C) and 5.11(B) of the Rules of Professional Conduct of the North Carolina State Bar (hereinafter "RPC")[2] mandate the disqualification of Barber & Associates.

RPC 5.1(C) states,

A lawyer shall have a continuing obligation to evaluate all situations involving potentially conflicting interests and shall withdraw from representation of any party he or she cannot adequately represent or represent without using the confidential information or secrets of another client or former client except as Rule 4 of this chapter would permit with respect to a client.

RPC 5.11(B) provides,

When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rule 4 of this chapter that is material to the matter.

Finally, Rule 4 of the RPC protects confidential information, defined in Rule 4(A) as "information protected by the attorney-client privilege under applicable law ... and other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client."

Thus, as the parties recognize, whether a conflict under RPC 5.11(B) exists in this situation seems to turn on whether Barber, while employed at Ward and Smith, acquired information protected by RPC 4 that is mate-

---

2. As noted at page 478 of the 1996 edition of the Annotated Rules of North Carolina, the Code of Professional Responsibility was adopted by the Council of the North Carolina State Bar on January 12, 1973, amended April 13, 1973, and approved by the Supreme Court April 30, 1973, to become effective January 1, 1974. The Rules of Professional Conduct, approved by the Supreme Court October 7, 1985, extensively rewrote and replaced the Code of Professional Responsibility.

The Rules of Professional Conduct were readopted effective December 8, 1994, as part of a recodification of the Rules and Regulations of the North Carolina State Bar.

The court believes that Local Rule 2.10, EDNC, still refers to the Code of Professional Responsibility, rather than the Rules of Professional Conduct, through mere oversight. The undersigned will address this topic with the Clerk and the other judges of this court.

rial to this case. Plaintiff argues that the burden rests upon Barber to show that he should not be disqualified. While not pointing to any specific confidential information shared with Barber, plaintiff believes that *any* information Mr. Tayloe shared with Mr. Barber while Barber was at Ward and Smith is confidential information protected by Rule 4 of the RPC. Further, says the plaintiff, Tayloe did discuss with Barber his thoughts and impressions about the case, and "a stark appearance of impropriety and unfairness exists which Defendants should not be able to exploit." (Pl.'s Mem.Supp.Mot. to Disqualify Timothy C. Barber at 5.)

On the other hand, defendants claim that federal common law places the initial burden of establishing a prima facie case for disqualification upon the party seeking the disqualification. Defendants argue that the plaintiff has not carried this burden because the record establishes conclusively that Barber acquired no confidential information regarding Furbush's case against OMS and Poe. Thus, conclude the defendants, the court should not disqualify Barber.

■ The court need not resolve these disputes. Regardless of which side bears the "burden of proof" upon this motion, if there be any such thing, and regardless of the conversations Barber and Tayloe now do or do not remember, the undisputed evidence shows that Barber and Tayloe directly discussed at least some of the details of this case while Barber worked at Ward and Smith. The court cannot conclude on the evidence before it, as the defendants ask, that Barber acquired no information material to this case and protected by RPC 4 while at Ward and Smith.

The court does not doubt Mr. Barber's assertion that he has "racked [his] brains to recall [the] discussions and any scintilla of confidential information [he] had about the matter while ... at Ward and Smith," but can remember none. (Letter from Barber to Tayloe of 11/14/95, at 2.) However, the possibility remains that Barber may recall something later; more to the point, the court agrees with plaintiff that these circumstances create "a stark appearance of impropriety and unfairness," which the court will not let

stand. The court will not require Mr. Tayloe to recall every detail of a conversation that occurred more than 15 months ago to correct the appearance of impropriety. Indeed, the Rules of Professional Conduct would not require this either. Canon IX declares, "A Lawyer Should Avoid Even the Appearance of Professional Impropriety." Barber has certainly not lived up to that standard, and in effect, he asks the court and the parties to overlook it.

Citing paragraph 13 of the Comment to RPC 5.11, defendants argue vehemently that a lawyer may be disqualified only when he acquires actual knowledge of confidential information protected by RPC 4. The comment also clarifies, however, that

> [p]reserving confidentiality is a question of access to information. Access to information, in turn, is essentially a question of fact in particular circumstances, aided by inferences, deductions, or working presumptions that reasonably may be made about the way in which lawyers work together. A lawyer may have general access to files of all clients of a law firm and may regularly participate in discussions of their affairs; it should be inferred that such a lawyer in fact is privy to all information about all the firm's clients.

In these circumstances—where Barber had general access to the Furbush file and participated in at least one discussion of Furbush's affairs—the court believes the disqualification of Barber & Associates to be proper.

Defendants also rely on an ethical opinion of the North Carolina State Bar (*RPC 45*) and two cases from other jurisdictions in support of their position that disqualification is not warranted. *RPC 45* and one of the cases cited, *Kitts v. U.S. Health Corp. of S. Ohio*, 97 Ohio App.3d 271, 646 N.E.2d 555 (1994), are inapposite. In neither of these situations did the attorney whose continued participation was challenged actually discuss the case while involved on the other side. The second case, *Pacific Employers Ins. Co. v. P.B. Hoidale Co.*, 789 F.Supp. 1112 (D.Kan.1992), more closely resembles the situation here, but the court disapproves of the analysis in that opinion and declines to adopt it.

In that case the defendant moved to disqualify the law firm representing the plaintiff, on the grounds that an attorney with that firm had previously worked on the case while employed by the law firm representing the defendant. The defendant based its motion on Rule 1.10(b) of the Model Rules of Professional Conduct, which is nearly identical to RPC 5.11(B). The court read that rule narrowly, to require a specific factual finding that the attorney had actual knowledge of material and confidential information in order to justify disqualification. *Id.* at 1113. The court found that the attorney in the firm representing the plaintiff, while he had been an associate with the law firm representing the defendant, had participated in a two hour meeting with partners of the firm to discuss the case and to receive research assignments. However, the court found no evidence of actual knowledge of material and confidential information, and on that basis denied the motion to disqualify. *Id.* at 1114, 1116.

This court disapproves such a cramped and narrow interpretation of RPC 5.11(B). Another court in this circuit demonstrated a better approach in *Roberts & Schaefer Co. v. San–Con, Inc.,* 898 F.Supp. 356 (S.D.W.Va. 1995). In that case an attorney with the law firm of Steptoe & Johnson, not realizing that the firm already represented the plaintiff, reviewed the dispute between the parties and prepared an evaluation letter for the defendant. When the conflict of interest came to light, Steptoe & Johnson withdrew from representation of both parties. Soon afterwards, however, Steptoe & Johnson merged with the firm the plaintiff had hired to represent it following Steptoe & Johnson's withdrawal.

In allowing the defendant's motion to disqualify the "new version" of Steptoe & Johnson, Judge Goodwin looked to the "appearance of impropriety" standard. While recognizing the criticism of this standard in the comments to W.Va.R.Prof. Conduct 1.10 (the same comments following RPC 5.11(B)), the court held this standard to be instructive, and it quoted the concordant view of the Fourth Circuit:

> In determining whether to disqualify counsel for conflict of interest, the trial court is not to weigh the circumstances "with hairsplitting nicety" but, in the proper exercise of its supervisory power over the members of the bar and with a view of preventing "the appearance of impropriety," it is to resolve all doubts in favor of disqualification. Neither is the court to consider whether the motives of counsel in seeking to appear despite his conflict are pure or corrupt; in either case the disqualification is plain.

*Id.* at 359, quoting *United States v. Clarkson,* 567 F.2d 270, 273 n. 3 (4th Cir.1977).

This court recognizes, as did Judge Goodwin, that the "appearance of impropriety" standard has met with disfavor in the current trend towards liberalizing the rules of imputed disqualification. The court also acknowledges the valuable right of litigants to be represented by counsel of their choice, and the necessary right of counsel to move from firm to firm freely. Neither does the hardship worked upon the defendants in this case by the disqualification of their attorneys escape the court's notice. However, all these concerns must bow to the absolute necessity of preserving the highest ethical standards and the integrity of our profession. This court agrees with Judge Goodwin that "[i]n an age of sagging public confidence in our legal system, maintaining confidence in that system and in the legal profession is of the utmost importance." *Roberts & Schaefer,* 898 F.Supp. at 363.

In these circumstances—where the lawyer for the defendants previously worked for the firm representing the plaintiff and actually discussed the case while at that firm—the court finds a *conflict of interest under Rule 5.11(B)* of the Rules of Professional Conduct of the North Carolina State Bar. For the foregoing reasons, the plaintiff's motion to disqualify Barber & Associates as counsel for the defendants is hereby **ALLOWED**.

### III. Conclusion

In summary, the plaintiff's motion to disqualify Timothy C. Barber and Barber & Associates as counsel for the defendants is allowed, and the defendants' motions to dis-

miss pursuant to Fed.R.Civ.P. 12(b)(2) are denied.

SO ORDERED.